UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

NATHAN PAUL WESTBERG,

                Petitioner,            Case No. 1:07-cv-82

v.                                   Honorable Robert Holmes Bell

CARMEN PALMER,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. After a jury trial, Petitioner was convicted of armed robbery, MICH. COMP. LAWS § 750.529; breaking and entering a building with intent to commit larceny, MICH. COMP. LAWS § 750.110; and conspiracy to commit breaking and entering, MICH. COMP. LAWS § 750.157a. Petitioner is serving prison terms of fifteen to forty years for the armed-robbery conviction, six to ten years for the breaking-and-entering conviction, and six to ten years for the conspiracy conviction, imposed by the Ottawa County Circuit Court on June 23, 2003. In his *pro se* petition, Petitioner raises two grounds for habeas corpus relief, as follows:

    I.      PROSECUTORIAL USE OF PETITIONER'S POST-ARREST SILENCE VIOLATED THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION, AND THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

    II.    THE SENTENCING JUDGE SCORED THE STATUTORY SENTENCING GUIDELINES RANGE BASED UPON INACCURATE INFORMATION AND ALLEGED FACTS NOT PROVEN TO THE JURY BEYOND A REASONABLE DOUBT, IN VIOLATION OF *BLAKELY V.*

*WASHINGTON*, AND IN CONTRAVENTION OF THE 6TH AND 14TH
AMENDMENTS TO THE UNITED STATES CONSTITUTION.

(Br. in Supp. of Pet. at v, docket #2.)  Respondent filed an answer to the petition (docket #7) stating

that the grounds should be denied because ground one is procedurally defaulted and ground two is

a noncognizable state law claim, which has no merit.  Petitioner filed a response (docket #8) to

Respondent's answer.  Upon review and applying the Antiterrorism and Effective Death Penalty

Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA) standards, I find that both grounds are without

merit.  Accordingly, I recommend that the petition be denied.

## Procedural History

### A.    Trial Court Proceedings

Petitioner, along with two accomplices, was charged with armed robbery, breaking

and entering and conspiracy to commit breaking and entering for forcing his way into a building at

Grand Valley State University (GVSU) in the early morning hours of August 26, 2002, stealing

money and beating Michael Jenkins with a crowbar.  Following a preliminary examination on

October 9, 2002, Petitioner was bound over on all three charges.  Petitioner was tried before a jury

beginning May 13, 2003, and concluding on May 16, 2003.[1]

Michael Jenkins, the victim, testified first for the prosecution.  (Tr. II, 2, docket #13.)

Jenkins worked as a computer operator at GVSU on August 26, 2002.  (Tr. II, 2, 5.)  Specifically,

Jenkins worked third shift in Manitou Hall.  (Tr. II, 2-3.)  Around 4:00 a.m. on August 26, Jenkins

heard glass breaking while he was working.  (Tr. II, 5-6.)  Jenkins decided to investigate.  (Tr. II,

6.)  On his way, he encountered someone coming around one of the computer servers.  (Tr. II, 6.)

_____

[1]Transcripts from the May 13, 14, 15 and 16, 2003 trial (docket #13) were consolidated into a single volume.
Because the volume is designated as 'Volume II,' this Court will reference all of the transcripts of the trial as 'Tr. II.'

That person's face was covered and he had a crowbar raised in his hand. (Tr. II, 6.) Jenkins kicked the intruder and the intruder fell down. (Tr. II, 6.) A few seconds later, someone hit Jenkins in the back of his head. (Tr. II, 7.) Eventually, all three ended up on the floor and the two intruders subdued Jenkins. (Tr. II, 10-11.) One of them began to hit Jenkins again. (Tr. II, 10.) Jenkins testified that he was hit multiple times with a flashlight and a crowbar. (Tr. II, 12.) During the assault, Jenkins never saw the intruders' faces because they were wearing ski masks. (Tr. II, 12.) One of the intruders asked, "where is the money?" (Tr. II, 11.) Jenkins replied that it was back in the vault. (Tr. II, 11.)

The intruder with the flashlight went to look for the money and Jenkins was left with the other intruder. (Tr. II, 13.) Jenkins noticed that the intruder had pale skin because he did not have on any socks. (Tr. II, 13-14.) Jenkins and the intruder fought again and Jenkins almost overtook the intruder. (Tr. II, 14.) However, the other intruder came back and started beating Jenkins because he could not find the money. (Tr. II, 14.) Jenkins was able to get the intruders off of him by pushing some shelving towards them and crawling under a work table. (Tr. II, 15-16.) Jenkins kicked his feet to protect himself. (Tr. II, 16.) The intruder with the crowbar "pick[ed]" at Jenkins' legs. (Tr. II, 16.) The other intruder asked "where is that money?" (Tr. II, 16.) Jenkins replied that it was back there. (Tr. II, 16-17.) At that point, the intruder with the flashlight spoke on a two-way radio. (Tr. II, 17.) He then left and went back to find the money. (Tr. II, 17.) The intruder with the crowbar told Jenkins to get out from under the table and show them the money. (Tr. II, 17.) Jenkins did not move. (Tr. II, 18.)

On cross-examination, Jenkins testified that he could not identify the intruders because of the masks that they were wearing. (Tr. II, 17.) On re-direct, Jenkins stated that the

person with the crowbar had lighter skin than the person with the flashlight. (Tr. II, 28.) Jenkins noted that Petitioner had lighter skin than Powell. (Tr. II, 28.)

Charity Anderson testified that she worked as a custodian at GVSU in August 2002. (Tr. II, 29-30.) Anderson saw Michael Jenkins after the beating. (Tr. II, 30.) She was spraying off the steps of Mackinac Hall, which is adjacent to Manitou Hall. (Tr. II, 30.) Anderson heard someone calling for help and ran between Mackinac and Manitou Halls. (Tr. II, 30.) She encountered Jenkins and asked him what happened. (Tr. II, 30-31.) Jenkins staggered toward her, told Anderson that he had been attacked, and fell down. (Tr. II, 31.) Anderson noticed that Jenkins' face was covered in blood. (Tr. II, 31.) Anderson then went into a building and called for help. (Tr. II, 31-32.)

Julie Sanderson, a police officer with GVSU, was on duty on August 26. (Tr. II, 35.) At approximately 4:36 a.m., she was dispatched to Manitou Hall because of five 911 calls. (Tr. II, 36.) As she turned into the parking lot, she received a call that there had been an assault. (Tr. II, 39.) At that moment, her headlights illuminated a man lying on his back in the parking lot. (Tr. II, 39.) Sanderson noticed several lacerations and swelling on his head. (Tr. II, 40, 42.) Sanderson called for canine back up and an ambulance. (Tr. II, 40.) Charity Anderson then ran out of the Mackinac Hall and told her that Michael Jenkins had been attacked. (Tr. II, 40-41.) Sanderson covered Jenkins with a blanket and talked to him. (Tr. II, 42.) Jenkins told Sanderson that he did not know who assaulted him. (Tr. II, 43.) He just stated that they wanted money. (Tr. II, 43.) As he lost more blood, Jenkins became confused. (Tr. II, 43.) Anderson assisted Sanderson with wounds to Jenkins' head. (Tr. II, 43.) Sanderson also gave Jenkins' oxygen before the paramedics arrived. (Tr. II, 43-44.) Sanderson learned from Jenkins that his attackers where two young, male

college age students.  (Tr. II, 44.)  Jenkins thought they were white men.  (Tr. II, 44.)  When the paramedics arrived, Sanderson saw Mr. Maxfield running towards her.  (Tr. II, 44-45.)  Mr. Maxfield told Sanderson that someone wearing a Michigan State hooded sweatshirt was running over the Little Mac Bridge. (Tr. II, 45-46.)

William Fisher testified that he was the technical support manager at GVSU.  (Tr. II, 47.)  Fisher supervised the equipment in the computer room.  (Tr. II, 47.)  The police asked Fisher to confirm if anything was taken from the computer room.  (Tr. II, 49.)  Fisher verified that a money bag and a money box were gone.  (Tr. II, 49.)  He estimated that $450.00 was taken.  (Tr. II, 51.)  The money was collected from long distance calling cards.  (Tr. II, 61.)

John Lyman testified that he is a police detective at GVSU.  (Tr. II, 55.)  Detective Lyman reviewed several photos of the crime scene.  (Tr. II , 57-62.)  Those photos were admitted into evidence.  (Tr. II , 61-62.)

Ernesto Soto testified that he was nineteen years old at the time of the trial.  (Tr. II, 65.)  Soto lives near Chicago, Illinois.  (Tr. II, 65-66.)  In exchange for his testimony in the case, the prosecution dropped the charge of conspiracy to commit breaking and entering and allowed Soto to plead guilty to a single count of breaking and entering.  (Tr. II, 67.)

Soto considered Petitioner to be his best friend.  (Tr. II, 68.)  They lived near each other in Illinois while growing up and worked at a Denny's restaurant together.  (Tr. II, 68-71.)  Soto also met one of Petitioner's friends, Joshua Powell, once or twice.  (Tr. II, 74.)

In the summer of 2002, Petitioner mentioned to Soto that he was going to do something illegal in Michigan.  (Tr. II, 73.)  At that point, one of Petitioner's friends was supposed to be "the accomplice."  (Tr. II, 73.)  Petitioner told Soto over the phone that they knew where there

was some money. (Tr. II, 75.) At that time, Soto had nothing to do with it because Petitioner's friend was involved. (Tr. II, 76.) When Petitioner's friend told Petitioner that he was no longer going to do it, Petitioner asked Soto to become his lookout. (Tr. II, 73, 76.) In return, they would help Soto with his money problems. (Tr. II, 76.) Soto's home was in the process of being repossessed. (Tr. II, 76.) Soto agreed to act as the lookout. (Tr. II, 76.)

Eventually, Petitioner called Soto on the phone and told him that it was going to happen on the opening day of the school. (Tr. II, 77-78.) Petitioner came to Soto's parents' house. (Tr. II, 78.) Soto told his parents that they were going out for dinner and would return in an hour. (Tr. II, 78.) It was around 11:00 or 11:30 p.m. at night. (Tr. II, 79.) Petitioner was in a black Blazer rental car along with Joshua Powell. (Tr. II, 79-80.) Soto thought they would collect a couple thousand dollars and would split it three ways. (Tr. II, 80-81.) They took off for Michigan. (Tr. II, 81.) Soto slept most of the way to Michigan. (Tr. II, 81.) Petitioner and Powell took turns driving to Michigan. (Tr. II, 81.) They stopped at a rest area before getting to the university. (Tr. II, 81.) At the rest area, Petitioner and Powell changed into black pants and black-hooded sweatshirts and changed their shoes. (Tr. II, 82.) Soto was dressed in black sweat pants and a white shirt with white shoes. (Tr. II, 83.) Because he did not like wearing white, Soto changed into Petitioner's Michigan State University hooded sweatshirt. (Tr. II, 83, 85.)

While driving to GVSU, Soto was given a police scanner and a two-way walkie-talkie. (Tr. II, 90-92.) Soto would use those items in case the police mentioned anything about GVSU on the scanner. (Tr. II, 92.) Soto and Powell tested the scanner and radio out in the car. (Tr. II, 90-92.) When they arrived at GVSU, they parked in a parking lot. (Tr. II, 85, 94.) Soto thought they arrived at GVSU around 5:00 a.m. (Tr. II, 93-94.) After Petitioner and Powell got out of the

car, they put on masks with "eye opening[s]" and gloves, and took Petitioner's green backpack with them. (Tr. II, 98, 100-02.) Soto remembered that Petitioner had black gloves with red plastic on them and Powell had black gloves. (Tr. II, 102.) Soto handed the backpack to Petitioner and noted that it was heavy. (Tr. II, 98.) He also remembered that Petitioner and Powell brought a large flashlight with them. (Tr. II, 99.) Powell placed the flashlight in Petitioner's backpack. (Tr. II, 99.) Soto did not remember seeing a pry bar. (Tr. II, 99.)

At the parking lot, Soto was told to go "that way" and they would eventually meet up with him. (Tr. II, 94.) Soto sat down near some woods. (Tr. II, 96.) While he was listening to the scanner, Soto ran into a GVSU worker, who asked what Soto was doing. (Tr. II, 115.) Soto told him that he was looking for his girlfriend. (Tr. II, 115.) Soto hid the police scanner and walkie-talkie in the pocket of his sweatshirt. (Tr. II, 115-16.) Soto had earphones that were connected to the scanner. (Tr. II, 93, 116.) Soto then left and did not look back. (Tr. II, 116.) After awhile, Soto began to think that it was taking too long. (Tr. II, 97.) Soto tried to reach the others on the walkie-talkie but he did not receive a reply. (Tr. II, 97.) Soto called again on the walkie-talkie but there was no answer. (Tr. II, 97.) Soto heard glass break. (Tr. II, 103.) He then heard the police scanner say something about GVSU. (Tr. II, 97, 103.) He tried to radio the others several times but nothing happened. (Tr. II, 98, 104.) Soto was worried because of the length of time and because he heard "Grand Valley" over the police scanner. (Tr. II, 104.) At one point, Soto heard someone say shut up on the walkie-talkie. (Tr. II, 98, 104.) Soto thought it was Powell's voice. (Tr. II, 104.) Soon thereafter, he saw the police with flashlights and began to run. (Tr. II, 98.) Soto ran from the wooded area to the bridge and back to the brush again. (Tr. II, 105.) Soto tried to put some mud

on him so the dogs would not find him.  (Tr. II, 105.)  A dog, however, located him and the police came immediately afterward.  (Tr. II, 107.)

When Soto was brought in for questioning, he was interviewed by Detective John Lyman.  (Tr. II, 108.)  Soto told him what he had done but only mentioned the first names of the accomplices.  (Tr. II, 108.)  He was then sent to Ottawa County Jail.  (Tr. II, 109.)  A day later, he told the last names of his accomplices to the police.  (Tr. II, 110.)

Soto also testified that he partied with Petitioner and Powell at Damon Lee's house a couple months before the breaking and entering.  (Tr. II, 113.)

On cross-examination, Soto testified that Petitioner talked to him in March 2002 about "hit[ting] up a spot," i.e. robbing a place, with Powell and Roger Williams[2]. (Tr. II, 121-23, 125, 128.)  Soto talked with Petitioner about it over the phone.  (Tr. II, 127.)  A week or two before the incident, Soto learned that J.R. had backed out of the plan with Petitioner.  (Tr. II, 128-29.)  Soto was then invited to be the third person.  (Tr. II, 129.)  Soto agreed because of his family's financial problems.  (Tr. II, 129.)  Two weeks later, Petitioner and Powell called and stopped by Soto's home to pick him up.  (Tr. II, 129-30.)  Soto was picked up in a black Blazer.  (Tr. II, 132-33.)

Pat Maxfield testified that he was a general maintenance specialist at GVSU on August 26, 2002. (Tr. II, 166.)  He was assigned to security duties.  (Tr. II, 166-67.)   In the early mornings hours that day, Maxfield ran into a suspicious individual.  (Tr. II, 167.)  Maxfield thought he looked suspicious because it was very early in the morning and he was wearing a hooded, green Michigan State sweatshirt even though it was a warm morning.  (Tr. II, 168-69.)  Maxfield said good

---

[2]Ernesto Soto testified that he referred to Roger Williams as "Junior."  (Tr. II, 128.)  However, Roger Williams testified that he went by "J.R."  (Tr. II, 249.) For purposes of this Report and Recommendation, I will refer to Roger Williams by his nickname, "J.R."

morning to the young man but the individual did not acknowledge Maxfield. (Tr. II, 169.) Maxfield then entered a building and heard that there had been an assault over his radio. (Tr. II, 170.) He looked at the young man and noticed that he was acting funny. (Tr. II, 171.) Maxfield yelled at the individual and asked him if he had any identification. (Tr. II, 171-72.) The person stated that he did not have an ID. (Tr. II, 172.) He was just out to have cigarettes. (Tr. II, 172.) However, he was not smoking. (Tr. II, 172.) The individual also mentioned that he was waiting for his girlfriend. (Tr. II, 172.) Maxfield told him to be careful because they just had an assault. (Tr. II, 172-73.) He also told him that he wanted to look at his face and pulled down his hood to take a look at him. (Tr. II, 173.) Maxfield recognized the suspicious young man as Ernesto Soto. (Tr. II, 173.)

Mike Ercole testified that he is a police officer with the City of Grand Haven. (Tr. II, 184.) He is also a dog handler for the department. (Tr. II, 184.) At approximately 4:29 a.m., Officer Ercole was called to search for an individual at GVSU with his dog. (Tr. II, 186.) Upon arriving at GVSU, the dog was able to pick up a scent and tracked the scent to a suspect. (Tr. II, 187-90.) Once he called the dog off, two other police officers made the arrest. (Tr. II, 190.) After finding the suspect, the police also found a scanner and a walkie-talkie. (Tr. II, 191.)

Venus Dyke, a detective with the Ottawa County Sheriffs' Department, testified that he was called out to GVSU on August 26, 2002. (Tr. II, 196.) He was asked to assist in gathering evidence in regards to a blood splatter. (Tr. II, 197.) During that investigation, Detective Dyke also found a beaded necklace on the floor. (Tr. II, 197.)

Officer Richard Horwood of the City of East Lansing Police Department testified that he arrested Petitioner on August 28. (Tr. II, 200-02, 204.)

The prosecution then called Detective John Lyman again to testify. (Tr. II, 211.) Detective Lyman interviewed Ernesto Soto a few hours after he was captured. (Tr. II, 211.) During the interview, Soto admitted his role as being an accomplice. (Tr. II, 212-13.) He referred to the others by their first names, and eventually gave Petitioner's full name to Detective Lyman but only Joshua Powell's first name. (Tr. II, 213-15.) The next day, Soto met with Detective Lyman again and gave him Powell's full name. (Tr. II, 217.) Detective Lyman then sought arrest warrants for Petitioner and Powell. (Tr. II, 218.) When Petitioner was arrested, the police obtained his green backpack as evidence. (Tr. II, 220-21.) Eventually, Detective Lyman obtained a search warrant for the backpack. (Tr. II, 221.) From the backpack, Detective Lyman recovered a receipt from Dicker and Deal, which itemized the serial number for the purchase of a police scanner. (Tr. II, 222.) Detective Lyman compared the serial number from the receipt to the serial number on the police scanner and the serial numbers matched. (Tr. II, 226-27.) Detective Lyman also obtained a parking receipt from the Chicago O'Hare International Airport, which was dated August 25, 2002 at 5:49 p.m. (Tr. II, 224.) The time out on the airport parking receipt was 7:49 p.m. (Tr. II, 224.)

Sheila Tyler testified that she worked at Dicker and Deal in East Lansing in August 2002. (Tr. II, 235.) Tyler reviewed two receipts for Bell South walkie-talkies. (Tr. II, 237.) Tyler noted that she initially rang the walkie-talkies up wrong and then corrected the transaction, creating two receipts. (Tr. II, 237-38.) Besides the scanner and Bell South walkie-talkies, Tyler testified that they purchased a disk player and a DVD. (Tr. II, 244.)

J.R. testified that he was twenty-five years old at the time of the trial. (Tr. II, 249.) For his testimony in this case, J.R. would not be charged with being an accessory after the fact of a felony. (Tr. II, 250.) J.R. had four other felony convictions: he pled guilty to three counts of

receiving and concealing stolen property when he was nineteen years old and pled guilty to one count of breaking and entering two weeks before his testimony. (Tr. II, 250-52.) At the time of the trial, J.R. was engaged to Sarah Stanick. (Tr. II, 249.) Between January and March 2002, Stanick worked in the telephone office at GVSU. (Tr. II, 252.) Stanick mentioned that during opening weekends, they would get a large sum of money from selling phone cards. (Tr. II, 253.) Stanick never told anyone to steal the money. (Tr. II, 253.) J.R. devised a plan from information obtained from Stanick. (Tr. II, 253.) J.R. knew where the money was located because he had visited Stanick at work several times. (Tr. II, 253.) J.R. also knew that there was a person in that building at all times. (Tr. II, 254.)

J.R. approached Joshua Powell and Petitioner about the money. (Tr. II, 254.) In June, J.R. and Powell went to GVSU to check out the building. (Tr. II, 255.) Later that month, J.R., Powell and Petitioner went to GVSU to look at the building. (Tr. II, 256.) They did not go inside because it was locked. (Tr. II, 256.) J.R. picked Sunday, August 25 and Monday, August 26, as the dates to take the money because the money would be in the building. (Tr. II, 257.) J.R. and Powell discussed making duplicate keys or using a glass cutter on the window to enter the building. (Tr. II, 263.) Once inside the building, J.R. and Powell determined that they would overcome the employee by using an empty gun and tying him up. (Tr. II, 264.) In late June or early July, however, J.R. told Powell that he wanted out. (Tr. II, 257-58.) After J.R. told Petitioner that he wanted out, they never talked about it again. (Tr. II, 262.)

On August 26, J.R. received two phone calls from Powell but J.R. was not home. (Tr. II, 264.) Stanick told J.R. that Powell called. (Tr. II, 264.) When he returned Powell's call, Powell asked J.R. to meet him behind the Big Boy in Standale. (Tr. II, 265.) J.R. arrived at the Big Boy

around 10:30 a.m. (Tr. II, 265.) Powell and Petitioner were sleeping in a silver Blazer. (Tr. II, 265.) J.R. woke them up. (Tr. II, 266.) J.R. knocked on the window of the car and Powell rolled down the window and stated that things were "fucked up." (Tr. II, 267.) Powell explained that the amount of money they were hoping to find was not there and a third person never showed up at the vehicle. (Tr. II, 267-68.) Eventually, J.R. and Petitioner went into Big Boy while Powell stayed in the truck. (Tr. II, 269.) While in the restaurant, Petitioner told J.R. that they broke a window to enter the building. (Tr. II, 269.) Once inside, a man came around the corner and Petitioner hit him. (Tr. II, 269-70.) Petitioner stated that they struggled and they tied him up. (Tr. II, 270.) When they heard on the radio that someone was coming, they hid in a "ravine or something" all night. (Tr. II, 270.) Petitioner also mentioned that they got about $500. (Tr. II, 269.)

When they were finished at Big Boy, J.R. and Petitioner went outside and woke Powell up. (Tr. II, 270.) Powell then asked J.R. to get rid of a bundle of clothes from the back of the truck. (Tr. II, 270.) J.R. also took a pair of boots. (Tr. II, 271.) J.R. took the clothes and threw them out of a second floor window of a recording studio into an overgrown area next to the building. (Tr. II, 272-74.) Petitioner and Powell also asked J.R. to call the Ottawa County Jail to see if they had Ernesto Soto. (Tr. II, 276.) After three calls to the Ottawa County Jail, the jail finally confirmed that Soto was there. (Tr. II, 277.) J.R. then called Petitioner and Powell with the news. (Tr. II, 277.) Petitioner and Powell were still sleeping behind the Big Boy when J.R. called. (Tr. II, 277.) J.R. told Petitioner and Powell to get their stuff in order because Soto was likely to turn them in. (Tr. II, 277.)

About a week or so later, Powell called J.R. to inform him that the police arrested Petitioner. (Tr. II, 278.) Powell wanted J.R. to help him move Powell's things to Powell's mother's

house.  (Tr. II, 278.)  At that time, J.R. was living in the upper peninsula.  (Tr. II, 278.)  During the move, J.R. discovered that the boots were still in his car.  (Tr. II, 285.)  J.R. then put the boots out for the garbage collector.  (Tr. II, 285.)  After Powell and J.R. moved Powell's things, they called the GVSU police and arranged to turn Powell in.  (Tr. II, 282.)  J.R. also spoke to Detective Lyman and Officer Brandon DeHaan.  (Tr. II, 284.)  J.R. explained that he initially planned the entire thing and he disposed of the clothes.  (Tr. II, 284.)

On re-cross examination, J.R. testified that he wrapped the flashlight in the clothes. (Tr. II, 313.)

Brandon DeHaan, a police officer with GVSU, testified next for the prosecution.  (Tr. II, 315.)  He interviewed J.R., who eventually took Officer DeHaan to the location where he had disposed of the clothing.  (Tr. II, 317-18.)  After the items were recovered by a crime scene technician, J.R. noted that they were missing the flashlight.  (Tr. II, 319-20.)  J.R. advised Officer DeHaan that there was a flashlight.  (Tr. II, 320.)  Officer DeHaan eventually recovered the flashlight.  (Tr. II, 320.)

From the bundle of clothing, Officer DeHaan retrieved two pairs of pants, gloves and masks.  (Tr. II, 321-24.)  Officer DeHaan identified several items recovered from the pockets of one pair of pants.  (Tr. II, 322-23.)  He found a CTA pass with the phone number 394-1000 and a bus pass dated January 2 through May 31, 2001 in one pair of pants.  (Tr. II, 322-23.)  On the back of the bus pass was the name of Petitioner and signature of Petitioner.  (Tr. II, 323.)  In that same pair of pants, Officer DeHaan found a glass cutter.  (Tr. II, 323.)  Officer DeHaan identified several photographs of the recovered items.  (Tr. II, 324.)

Wendy Whitmore testified that she is employed with the North Ottawa Community Hospital as a phlebotomist, a person who draws blood.  (Tr. II, 330-31.)  In August or September, Whitmore drew blood from Joshua Powell and Petitioner.  (Tr. II, 332.)

John Lyman, a GVSU police detective, confirmed that he picked up Petitioner and Joshua Powell to have their blood drawn at North Ottawa Community Hospital.  (Tr. II, 334.) Detective Lyman brought the blood to the Michigan State Police Crime Laboratory.  (Tr. II, 334.)

Crystal Jackson testified at the time of trial she was nineteen years old.  (Tr. II, 336.) Jackson resided at Northpoint Apartments in East Lansing.  (Tr. II, 336.)  Jackson met Joshua Powell, Petitioner and J.R. through various individuals. (Tr. II, 337-38.) Both Powell and Petitioner moved into her apartment complex.  (Tr. II, 338.)  After they moved in, Powell and Petitioner mentioned that they were going on vacation. (Tr. II, 341-42.)  Jackson was unsure if they were gone one or two weeks.  (Tr. II, 344.)  When they returned, Jackson saw both Petitioner and Powell in their apartment.  (Tr. II, 344.)  They looked as if they had been driving for a long time.  (Tr. II, 344.)

Amanda Souder testified that she was twenty-one years old at the time of the trial. (Tr. II, 357.)  She met Joshua Powell through J.R.  (Tr. II, 358.)  Souder dated Powell for a period of time.  (Tr. II, 358.)  She also met Petitioner through Powell.  (Tr. II, 358.)  On Friday, August 23, Souder went shopping with Powell and Petitioner.  (Tr. II, 359-60, 366.)  Initially, they went to Dicker and Deal in Lansing where Petitioner bought some walkie-talkies for paint ball.  (Tr. II, 360.) Next, they shopped at Best Buy and Petitioner bought a stereo system or  a DVD system for their new apartment.  (Tr. II, 361-62.)  They also went to M.C. Sporting Goods, where they bought camouflage masks for paint ball and a key chain flashlight.  (Tr. II, 362.)  At M.C. Sporting Goods, Petitioner tried on one of the masks to joke around.  (Tr. II, 362.)  Finally, they bought a glass cutter

at Ace Hardware.  (Tr. II, 363-64.)  On Saturday, Souder and Powell went to Radio Shack, where

Powell bought a book on police frequencies.  (Tr. II, 365-66.)  Petitioner had to work that day.  (Tr.

II, 366.)  Soon after going to Radio Shack with Powell, Souder left because Powell and Petitioner

were planning to leave on a trip to Chicago.  (Tr. II, 367.)

On cross-examination, Souder stated that Powell did not have any money at this time.

(Tr. II, 371.)

Paul Donald testified as an expert in DNA.  (Tr. II, 373, 378.)  When items come into

the crime lab, Donald looks at the items for DNA and ultimately to determine if any DNA matches

with certain suspects.  (Tr. II, 378.)  In order to do a DNA analysis, Donald uses a technique called

polymerase chain reaction (PCR).  (Tr. II, 383.)  The process takes thirteen locations of DNA to

review.  (Tr. II, 383.)  Donald received two masks at the laboratory and cut out a sample where the

mouth would have been located on both masks.  (Tr. II, 387.)   After processing the DNA on the

masks, Donald found that he was not able to get a DNA profile from one mask due to an insufficient

amount of DNA.  (Tr. II, 393.)  With regard to the second mask, he was able to obtain DNA from

the mouth area.  (Tr. II, 394.)  The DNA types obtained from the mouth area of the mask indicated

a mixture of two people, one which had a major DNA type and the other had a minor DNA types.

(Tr. II, 395-96.)  In this case, the major DNA profile, which had thirteen matched locations, on the

mask were similar to the DNA type, which was obtained from the sample from Joshua Powell.  (Tr.

II, 398.)  With regards to the minor DNA profile, Donald could only obtain eight locations with a

DNA profile.  (Tr. II, 398.)  At those eight locations, they were similar to the DNA type obtained

from Petitioner.  (Tr. II, 398.)

The possibility of finding someone in the population having a DNA profile that matched the major DNA types from his mask are one in 44.1 quadrillion in the Caucasian population, one in 1.2 quintillion in the black population and one in 178.8 quadrillion in the Hispanic population. (Tr. II, 402-03.) With regard to the minor DNA profile, there is a one in 12.6 billion for a match in the Caucasian population, one in 127.6 billion for a match in the black population and one in 43.9 billion for a match in the Hispanic population. (Tr. II, 403-04.)

Joshua Powell testified that he is currently in jail after pleading guilty to armed robbery and breaking and entering. (Tr. II, 414.) The charges for conspiracy to commit breaking and entering were dismissed in accordance with the plea agreement. (Tr. II, 414.) There was no agreement to have Powell testify in the instant case. (Tr. II, 414.) However, the prosecutor expressed interest in helping Powell with a guideline issue for an appeal, obtaining a check from his previous employer, and not contesting Powell's parole. (Tr. II, 415-16.)

Powell met Petitioner when he applied to work at Burger King in Lansing. (Tr. II, 416.) Powell also worked at Burger King. (Tr. II, 416.) Powell met J.R. approximately six years ago at Michigan State University. (Tr. II, 416.) At some point, J.R. approached Powell to steal some money at GVSU. (Tr. II, 417.) Powell, J.R. and Petitioner chose to do it during the opening week of GVSU. (Tr. II, 418.) J.R. mentioned that he was going to get copies of the keys from his fiancee to enter the building. (Tr. II, 418-19.) J.R. eventually backed out because he was moving to the upper peninsula and would not be in town that weekend. (Tr. II, 419.) J.R. mentioned that there would be between $10,000 and $30,000 in the building. (Tr. II, 420.) Powell and Petitioner decided to go ahead with the plan but decided that they needed a lookout. (Tr. II, 420.)

A few days before the robbery, Powell moved into an apartment with Petitioner. (Tr. II, 421.) He also went shopping with Amanda Souder and Petitioner on the Friday or Saturday before the robbery. (Tr. II, 422.) During that shopping trip, they picked up a scanner and walkie-talkies at Dicker and Deal, masks at MC Sporting Goods, and a DVD player at Best Buy. (Tr. II, 422-23.) Powell told Souder that the masks were needed for paint ball. (Tr. II, 424.) Powell testified that Petitioner bought a glass cutter to repair a broken window in his car and cut glass out of a window at GVSU. (Tr. II, 425.) The following day, Powell and Souder went back to Radio Shack and Powell bought police code books. (Tr. II, 425-26.) Later that day, Petitioner and Powell left for Chicago. (Tr. II, 425.)

While in Chicago, Powell and Petitioner decided to talk to Ernesto Soto about making some money. (Tr. II, 427.) They had previously told Soto that there might be a time that they would call him up for something. (Tr. II, 427.) Soto also knew that they were planning on going to Chicago that week because Powell had vacation time. (Tr. II, 427-28.) They planned on doing the robbery and driving back to Chicago. (Tr. II, 428.)

In Chicago, Powell rented a Chevy Blazer from Chicago O'Hare International Airport because it was cheaper for him to rent a car for the week, and also, they could use it for the robbery. (Tr. II, 428-30.) When they rented the car, they parked Powell's car at the airport. (Tr. II, 429.) A couple hours later, they picked up Powell's car and Petitioner drove it from the airport to his parents' home. (Tr. II, 429.) After talking to Petitioner's parents awhile, they called Ernesto Soto and told him that they were going to come over. (Tr. II, 431.) They picked Soto up and drove to Grand Rapids. (Tr. II, 433.) Along the way, they stopped at a rest area to change clothes. (Tr. II, 433.) Powell changed into black pants and a black fleece. (Tr. II, 433.) Petitioner drove to GVSU.

(Tr. II, 434.)  On the road trip, Powell programmed the scanner for all police stations from Grand Rapids to Grand Haven.  (Tr. II, 434-35.)  Because Soto did not know how to use a police scanner, Powell showed him how to use it.  (Tr. II, 434.)

After parking at GVSU, they gave Soto a walkie-talkie and the police scanner and told him to split up and meet by the building in five to ten minutes.  (Tr. II, 434.)  They met up by a bridge and told Soto that if he heard anything on the scanner, to let them know.  (Tr. II, 437.)  Powell and Petitioner then left Soto and headed to Manitou Hall.  (Tr. II, 437.)  When they arrived, Petitioner cut the window with the glass cutter.  (Tr. II, 438.)  The glass cutter did not work very well because the window was too thick.  (Tr. II, 439.)  Petitioner then kicked the window out and went through. (Tr. II, 439-40.)  Powell followed with his flashlight and backpack, which contained a change of clothes.  (Tr. II, 440.)  When Powell entered the building, he noticed that Petitioner was struggling with the victim.  (Tr. II, 441.)  Petitioner had a pry bar in his hand.  (Tr. II, 441.)  Powell grabbed the victim and threw him.  (Tr. II, 441.)

Powell had no idea where the money was located.  (Tr. II, 441.)  The victim told them that it was "back there."  (Tr. II, 442.)  Powell went to look for the money while Petitioner stayed to prevent the victim from calling the police.  (Tr. II, 442.)  Powell did not find the money the first time.  (Tr. II, 443.)  The victim told him again that it was back there.  (Tr. II, 444.)  Powell located the money the second time, put it in his backpack and left the building with Petitioner.  (Tr. II, 444.)  They tried to locate Soto outside of the building and called him on the radio to no avail.  (Tr. II, 445.)  While they were in the building, they had a couple calls from Soto wondering if everything was alright.  (Tr. II, 445.)

At one point, they were able to contact Soto, who mentioned the cops and dogs were coming. (Tr. II, 447.) Powell and Petitioner hid in a ravine for five hours. (Tr. II, 447.) Powell had a change of clothes in his backpack so he changed his clothes behind the art building. (Tr. II, 447.) Powell then walked back to the truck, gathered Petitioner's change of clothes into his backpack, and walked back to Petitioner so he could change. (Tr. II, 449.) After changing, they both left. (Tr. II, 449.) They first stopped at Powell's bank to deposit money in his account to cover the rental car expense. (Tr. II, 454.) Then they went to a Big Boy restaurant. (Tr. II, 451.) Powell thought they had obtained around $500 in the robbery. (Tr. II, 455.)

At Big Boy, Powell and Petitioner called J.R. on the phone and left a message with his fiancé to tell J.R. that they were at the Big Boy near Lake Michigan Drive. (Tr. II, 451.) Powell and Petitioner ate breakfast at the restaurant and then fell asleep in the car. (Tr. II, 451.) They woke up when J.R. knocked on the window. (Tr. II, 451.) Powell asked J.R. to call around to the jails to see if Soto was in jail. (Tr. II, 452.) J.R. and Petitioner then went into the restaurant while Powell slept in the car. (Tr. II, 452.) Powell woke up when J.R. and Petitioner returned. (Tr. II, 452.) Powell saw J.R. take the clothes that had been used in the robbery and his flashlight. (Tr. II, 452-53.)

Eventually, Powell learned that Soto was in Ottawa County Jail. (Tr. II, 455.) Powell asked J.R. to get Soto out of jail because they had to return to Chicago. (Tr. II, 456.) Around 1:00 or 2:00 p.m., Powell and Petitioner drove to Chicago to return the rental car. (Tr. II, 458-59.) They stayed for a few hours and then headed back to Michigan. (Tr. II, 459.)

The prosecution rested. (Tr. II, 490-91.)

Jessica Kay testified first for the defense. (Tr. II, 491.) Kay was the manager of the student phone service, Telecom. (Tr. II, 492.) She reported for work at 8:00 a.m. and learned of the robbery. (Tr. II, 492.) Kay knew of Sarah Stanick because she was the manager prior to Kay. (Tr. II, 493.) Kay had also met J.R. through Stanick. (Tr. II, 493.)

Damon Lee testified that he remembered that Petitioner and "Josh" came over on the Sunday night before school started to drink during Harvest Festival. (Tr. II, 499.) Lee knew Petitioner since they were children. (Tr. II, 498.) Lee was not certain of Josh's last name but he knew Josh was a friend of Petitioner's. (Tr. II, 500.) After Petitioner and Josh arrived, they went to a liquor store to buy alcohol. (Tr. II, 501.) All of them drank with a couple other friends named Joy and January. (Tr. II, 501.) Around 1:00 a.m., Josh made a phone call and left to meet up with someone. (Tr. II, 502.) Lee did not see Josh again until the morning. (Tr. II, 502.) Around 6:30 a.m., Petitioner left Lee's house with Joy because Lee's mother would be returning from work around 7:00 a.m. (Tr. II, 502.) Later that morning, Petitioner came back to Lee's house with Joy and waited for Josh. (Tr. II, 504.) Petitioner and Josh left Lee's house around noon. (Tr. II, 506.)

On cross-examination, Lee admitted smoking marijuana that night. (Tr. II, 510.) Lee explained that Josh came back around 11:00 a.m. but Petitioner was no longer there. (Tr. II, 511.) Josh went to look for Petitioner. (Tr. II, 512.) In the meantime, Petitioner came back to Lee's house. (Tr. II, 512.) When Josh returned, Josh and Petitioner left around noon. (Tr. II, 512.) Lee's school started on August 27. (Tr. II, 512.) Lee and Petitioner were both drunk that night. (Tr. II, 515.) Lee did not see Ernesto Soto that evening. (Tr. II, 515.)

Detective John Lyman testified as to the following items of evidence that were taken to the Michigan State Police Crime Lab for analysis: Ernesto Soto's shoes, the victim's fingernail

clippings and blood, Petitioner's shoes, flashlight, masks and gloves. (Tr. II, 525-30.) Detective Lyman stated that Ernesto Soto was arrested on August 26, 2002, the date of the robbery. (Tr. II, 530-31.) Petitioner was arrested on August 28. (Tr. II, 531.) Joshua Powell turned himself in on September 4. (Tr. II, 531.)

On cross-examination, Detective Lyman stated that Petitioner's shoes were recovered two days after the robbery. (Tr. II, 534.) He was not sure that Petitioner's shoes were used in the armed robbery. (Tr. II, 534-35.) The police crime lab only analyzed the masks. (Tr. II, 535.)

Petitioner testified on his behalf. (Tr. II, 539.) For the past two years, Petitioner lived in East Lansing while he attended Michigan State University. (Tr. II, 540.) He knew Ernesto Soto from working at Denny's in Illinois. (Tr. II, 540-41.) Petitioner met Joshua Powell from working at Burger King in Michigan. (Tr. II, 541.) Petitioner and Powell eventually moved into an apartment together. (Tr. II, 541.) Petitioner met J.R. through Powell. (Tr. II, 542.) J.R. and Powell accompanied Petitioner on one trip to Chicago about a month before the incident. (Tr. II, 543.)

Petitioner denied being at GVSU on August 26, 2002. (Tr. II, 544.) Petitioner testified that he was at Damon Lee's house. (Tr. II, 544.) That weekend, Petitioner and Powell drove to Chicago. (Tr. II, 544.) Petitioner remembered that he left on a Friday night because the Michigan State University students had moved in for their first week of classes and the parties were starting. (Tr. II, 545.) Powell drove because Petitioner did not have a driver's license. (Tr. II, 546.) Instead of putting the miles on his car, Powell rented a Chevy Blazer at the airport on Saturday. (Tr. II, 546-49.) About two hours later, Petitioner took Powell's car out of the parking lot and drove it to his parents' house. (Tr. II, 548.) They called Ernesto Soto on the phone to ask what he was doing

on Sunday night. (Tr. II, 550.) Soto mentioned that he could not go to Lee's house because he had school the next day. (Tr. II, 550.) After the phone call, Powell and Petitioner went to Lee's house. (Tr. II, 550.) Petitioner remembered that several people were at Lee's house, including two girls named Joy and January. (Tr. II, 550.) That night, they went to the liquor store to buy alcohol. (Tr. II, 551.) Around midnight, Powell left. (Tr. II, 551-52.) Petitioner stayed at Lee's house until 6:30 a.m. (Tr. II, 552.) On Monday, Petitioner drove back to Michigan with Powell. (Tr. II, 555.) Despite their friendship and long drive back to Lansing, Petitioner testified that Powell never mentioned anything about the robbery. (Tr. II, 581-82.)

Petitioner testified that he bought a mask for himself and Powell at MC Sporting Goods for paint ball. (Tr. II, 556.) A friend of Petitioner's, Donald Hudson, owned land where they would play paint ball. (Tr. II, 557.) Petitioner purchased walkie-talkies at Dicker and Deal for paint ball. (Tr. II, 558.) Petitioner also bought the police scanner at Dicker and Deal so they could determine whether the police were coming to break up one of their parties. (Tr. II, 559.) Petitioner then went to Best Buy and bought a DVD system for his apartment. (Tr. II, 561.) Finally, Petitioner purchased a plastic cutter at Ace Hardware to replace a broken window on Petitioner's car. (Tr. II, 562.)

Petitioner agreed that the two pairs of black pants, which were in evidence, seemed like pants that he owned. (Tr. II, 563.) Petitioner also identified his backpack that was turned over to police when he was arrested, the masks, the scanner, the walkie-talkies that were purchased at MC Sporting Goods and a student bus pass that was found in one of the pairs of pants. (Tr. II, 564-65, 567.) Petitioner did not recognize the glass cutter, gloves or necklace. (Tr. II, 566-68.)

Petitioner denied knowing about the robbery before it happened. (Tr. II, 569.) He did not learn of the robbery until after he was arrested. (Tr. II, 569.)

On cross-examination, Petitioner reiterated that he left for Chicago on Friday night with Joshua Powell. (Tr. II, 572.) When asked how Powell could have purchased the scanner in East Lansing on Saturday, Petitioner, stated that he could have been mistaken and they could have left on Saturday. (Tr. II, 572.) When they got to Chicago, Petitioner and Powell went to Petitioner's parents' house first. (Tr. II, 572-73.) Petitioner remembered that they rented the car at 7:00 p.m. but he was not certain if it was Saturday or Sunday night. (Tr. II, 573.) Petitioner and Powell arrived at Lee's house around 11:00 p.m. after Lee's mother had left for work. (Tr. II, 574-75.) Soon thereafter, they bought liquor and drank at Lee's house. (Tr. II, 575.) Powell eventually left to meet up with a girl. (Tr. II, 577.) Petitioner did not see Powell again until 1:00 p.m. the following day. (Tr. II, 578.)

Petitioner testified that Powell never told him that the scanner, radios, glass cutter and masks would be used in an armed robbery. (Tr. II, 581.) He did not know that the two masks, two pairs of his pants, a couple of radios, and a scanner were packed in Powell's car. (Tr. II, 583-84.) Petitioner testified that it would take someone around five minutes to get to Ernesto Soto's house from Petitioner's parents' house. (Tr. II, 590.)

Detective John Lyman testified regarding his second interview with Ernesto Soto and the description of Joshua Powell's mother's car and the rental car. (Tr. II, 594.)

The defense rested. (Tr. II, 598.)

The prosecution called Officer Brandon DeHaan as a rebuttal witness. (Tr. II, 599.) Because Damon Lee referenced the party occurring during Harvest Festival weekend, he obtained

information regarding the dates of the Harvest Festival. (Tr. II, 599.) Sergeant DeHaan found that Harvest Festival occurred on Friday, August 30, Saturday, August 31 and Sunday, September 1, 2002. (Tr. II, 600-01.)

The prosecution rested. (Tr. II, 602.)

At the conclusion of trial, on May 16, 2003, the jury found Petitioner guilty of armed robbery, breaking and entering a building with the intent to commit a larceny and conspiracy to commit breaking and entering. (Tr. II, 680-81.) On June 23, 2003, Petitioner was sentenced to prison terms of 15 to 40 years for armed robbery, 6 to 10 years for breaking and entering a building with intent to commit larceny and 6 to 10 years for conspiracy to commit breaking and entering. (Sentencing Transcript, (S. Tr.), 13-14, docket #16.)

## B. Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel, raised the following issues:

I.    THE DEFENDANT IS ENTITLED TO RESENTENCING BECAUSE THE JUDGE ERRED BY CONSIDERING INACCURATE INFORMATION DURING SENTENCING BECAUSE OF INCORRECT SCORING OF THE SENTENCING GUIDELINES.

II.   THE DEFENDANT'S CONVICTIONS SHOULD BE OVERTURNED BECAUSE THERE WAS INSUFFICIENT CREDIBLE EVIDENCE AT TRIAL TO PROVE THAT AN ARMED ROBBERY HAD OCCURRED, THAT A CONSPIRACY TOOK PLACE AS ALLEGED IN THE INFORMATION, OR THAT THE DEFENDANT PARTICIPATED IN THE CRIMES.

III.  THE PROSECUTOR'S ACTIONS DENIED THE DEFENDANT A FAIR TRIAL AND HIS DUE PROCESS RIGHTS UNDER THE MICHIGAN AND FEDERAL CONSTITUTIONS.

IV.   IF THE COURT DOESN'T CONSIDER ANY OF THE QUESTIONS PRESENTED BECAUSE OF A LACK OF OBJECTION BY TRIAL

COUNSEL, THEN THE DEFENDANT IS ENTITLED TO A NEW TRIAL
BECAUSE OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

(Def.-Appellant's Br. on Appeal at i-ii, docket #17.)

Petitioner also filed a *pro se* supplemental brief in the Michigan Court of Appeals.

In his supplemental brief, Petitioner requested the court to consider the following claims:

I.     WAS IT REVERSIBLE ERROR FOR THE PROSECUTOR TO
       QUESTION DEFENSE WITNESSES ON CROSS-EXAMINATION AND
       EMPHAS[IZE] IN HIS CLOSING ARGUMENT THAT THE JURY
       COULD INFER THAT IT WAS EVIDENCE AGAINST THE
       DEFENDANT'S INNOCENCE FOR THE DEFENDANT TO HAVE
       STOOD ON HIS CONSTITUTIONAL RIGHT TO REMAIN SILENT
       AFTER HIS ARREST?

II.    DID TRIAL COUNSEL FOR THE DEFENDANT CONSTITUTE
       INEFFECTIVE ASSISTANCE BY FAILING TO INVESTIGATE AND
       ATTEMPT TO LOCATE MORE THAN ONE CORROBORATING
       WITNESS FOR DEFENDANT'S ALIBI, BY REFUSING TO CONTACT
       DEFENDANT FOR THREE MONTHS AND THEN FORCING
       DEFENDANT TO ADJOURN TRIAL TO PREPARE, AND
       CONTINUOUSLY ALLOW THE PROSECUTOR TO IMPLY TO THE
       JURY THAT DEFENDANT'S POST-ARREST SILENCE WAS
       EVIDENCE OF HIS GUILT?

III.   WAS IT ABUSE OF DISCRETION FOR THE TRIAL JUDGE TO FAIL
       TO ADDRESS OR REVIEW THE DEFENDANT'S REQUEST FOR
       SUBSTITUTION OF COUNSEL, [AND] REVERSIBLE ERROR TO FAIL
       TO GIVE A CAUTIONARY INSTRUCTION ON WILLIAMS, AN
       UNDISPUTED ACCOMPLICE?

(Def.-Appellant's Supplemental Br. on Appeal, Table of Contents, docket #17.) By unpublished

opinion issued on January 13, 2005, the Michigan Court of Appeals rejected all appellate arguments

and affirmed Petitioner's convictions and sentences. (Jan. 13, 2005 Mich. Ct. Appeals Op. (MCOA

Op.), docket #17.) Petitioner then filed a motion for reconsideration, which was denied by the

Michigan Court of Appeals on March 1, 2005.  (Mar. 1, 2005 Mich. Ct. of Appeals Order, docket #17.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court raising the following claims:

I.     THE PROSECUTION DELIBERATELY BROUGHT OUT IRRELEVANT AND HIGHLY PREJUDICIAL INFORMATION.

II.    THE PROSECUTOR ARGUED FACTS NOT IN EVIDENCE.

III.   WITHOUT ANY FACTUAL BASIS, THE PROSECUTOR EXPRESSED HIS OWN PERSONAL BELIEF ABOUT THE FACTS OF THE CASE.

IV.    THE PROSECUTOR MISSTATED THE LAW, THUS VIOLATING HIS DUTY TO SEE THAT THE DEFENDANT HAD A FAIR TRIAL.

V.     THE TRIAL JUDGE COMMITTED REVERSIBLE ERROR AND ABUSE OF DISCRETION BY FAILING TO GIVE A CAUTIONARY INSTRUCTION REGARDING WILLIAMS, AN UNDISPUTED ACCOMPLICE.

VI.    THE DENIAL OF DEFENDANT'S REQUEST TO SUBSTITUTE COUNSEL, WITHOUT ANY INQUIRY, WAS AN ABUSE OF DISCRETION.

VII.   COUNSEL'S FAILURE TO OBJECT TO NUMEROUS INSTANCES OF MISCONDUCT PREJUDICED THE DEFENDANT.

VIII.  TRIAL COUNSEL'S FAILURE TO INVESTIGATE ANYMORE THAN ONE CORROBORATING ALIBI WITNESS CONSTITUTED INEFFECTIVE ASSISTANCE [OF COUNSEL].

IX.    BY FAILING TO PREPARE THE MATTERS ENTRUSTED TO HIM BY THE DEFENDANT AND FORCING DEFENDANT TO ADJOURN TRIAL TO PREPARE, DEFENSE COUNSEL'S PERFORMANCE CONSTITUTED INEFFECTIVE ASSISTANCE.

X.     THE DEFENDANT IS ENTITLED TO RESENTENCING BECAUSE THE JUDGE ERRED IN CONSIDERING INACCURATE INFORMATION DURING SENTENCING BECAUSE OF INCORRECT SCORING OF THE SENTENCING GUIDELINES.

XI.     APPELLATE COUNSEL, FAILING TO ESTABLISH A COMPLETE
        RECORD FOR REVIEW AND NEVER CONDUCTING ANY
        INTERVIEW WITH THE DEFENDANT, CONSTITUTED INEFFECTIVE
        ASSISTANCE.

(Def.-Appellant's *Pro Per* Application for Leave to Appeal at 2-8 & Attach., docket #18.) Petitioner

also attached the following additional claims to his *pro per* application for leave to appeal in the

Michigan Supreme Court:


I.      THE DEFENDANT WAS DENIED A FAIR TRIAL AND HIS DUE
        PROCESS RIGHTS UNDER THE MICHIGAN AND FEDERAL
        CONSTITUTIONS WHEN THE PROSECUTOR QUESTIONED
        DEFENSE WITNESSES ON CROSS-EXAMINATION REGARDING THE
        DEFENDANT'S EXERCISE OF HIS CONSTITUTIONAL RIGHT TO
        REMAIN SILENT AFTER HIS ARREST, EMPHASIZED IN HIS
        CLOSING ARGUMENT THAT THE JURY SHOULD MAKE
        INFERENCES OF THE DEFENDANT'S GUILT FROM THIS EXERCISE
        OF PRIVILEGE, AND TO TELL THE JURY THAT THERE WAS
        REALLY NO BARGAIN OF ANY IMPORTANCE FOR POWELL'S
        TESTIMONY.

II.     BY FAILING TO GIVE A CAUTIONARY INSTRUCTION ON
        WILLIAMS, AN UNDISPUTED ACCOMPLICE[], THE TRIAL JUDGE
        COMMITTED REVERSIBLE ERROR AND [AN] ABUSE OF
        DISCRETION, AND THE SAME BY FAILING TO ADDRESS OR
        REVIEW DEFENDANT'S REQUEST FOR SUBSTITUTION OF
        COUNSEL.

III.    BY CONTINUOUSLY ALLOWING THE PROSECUTOR TO IMPLY TO
        THE JURY THAT DEFENDANT'S POST-ARREST SILENCE WAS
        EVIDENCE OF HIS GUILT[], FAILING TO REQUIRE THE JUDGE TO
        INSTRUCT THE JURY ON A PRIMARY ELEMENT OF THE DEFENSE,
        BY REFUSING TO CONTACT DEFENDANT FOR THREE MONTHS
        THEN FORCING DEFENDANT TO ADJOURN TRIAL TO PREPARE
        BUT STILL NEGLECTING TO FILE NOTICE OF ALIBI, AND FAILING
        TO INVESTIGATE AND ATTEMPT TO LOCATE MORE THAN ONE
        CORROBORATING WITNESS FOR DEFENDANT'S ALIBI; TRIAL
        COUNSEL FOR THE DEFENDANT PROVIDED INEFFECTIVE
        ASSISTANCE OF COUNSEL.

IV.     THE DEFENDANT IS ENTITLED TO RE-SENTENCING BECAUSE THE JUDGE ERRED BY CONSIDERING INACCURATE INFORMATION DURING SENTENCING BECAUSE OF INCORRECT SCORING OF THE SENTENCING GUIDELINES.

V.      DEFENDANT'S ORIGINAL APPEAL OF RIGHT ENTITLED HIM TO THE EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL, WHICH HE WAS DENIED BECAUSE HIS APPOINTED APPELLATE COUNSEL NEVER HAD THE REQUIRED IN-PERSON INTERVIEW WITH HIM; AND FAILED TO ESTABLISH A COMPLETE RECORD FOR APPELLATE REVIEW.

(Attach. to Def.-Appellant's *Pro Per* Application for Leave to Appeal at 1, 19, 28, 35, 41, docket #18.)   By order entered October 31, 2005, the Michigan Supreme Court denied Petitioner's application for leave to appeal because it was not persuaded that the questions presented should be reviewed.   (Oct. 31, 2005 Mich. Order, docket #18.)   However, Justice Cavanagh would have granted leave to appeal and Justice Kelly would have held Petitioner's case in abeyance for *People v. Drohan, leave granted,* 472 Mich 881 (2005). (Oct. 31, 2005 Mich. Order, docket #18.)   The Michigan Supreme Court also denied Petitioner's motion for remand.   (*Id.*)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214.   *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.   *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).   The AEDPA has "drastically changed" the nature of habeas review.   *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).   An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:   "(1) resulted in a decision that was contrary to, or involved

an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision

applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### I.      Ground I:  Right to Remain Silent

In his first ground for habeas corpus relief, Petitioner argues that the prosecutor's reference to Petitioner's post-arrest, post-*Miranda*[3] silence during cross-examination, closing arguments and rebuttal arguments violated Petitioner's right against self-incrimination under the Fifth Amendment and Petitioner's due process rights under the Fourteenth Amendment.[4]

During cross-examination, the following exchange occurred between the prosecutor and Petitioner (verbatim):

---

[3]*See Miranda v. Arizona,* 384 U.S. 436, 479 (1966).

[4]In his application for habeas corpus relief, Petitioner states that he received his *Miranda* rights when he was arrested by Officer Richard Horwood of the City of East Lansing Police Department on August 28, 2002. (Br. in Supp. of Pet. at 15, docket #2; Ex. 4 to Br. in Supp. of Pet.).

Q:      My point is this.  Within a matter of days or weeks, you knew what the accusations were against you, what happened, what day it was, what date it was, what day, Sunday night, early Monday morning, 4:30 in the morning, Grand Valley, all those facts you knew about?

A:      Yes.

Q:      Within a matter of weeks from the arrest?

A:      I received the police reports.

Q:      And you read it all over?

A:      Absolutely.

Q:      And why in the world didn't you write a letter or make a phone call to Mr. Damon Lee and say, hey, remember what happened.  I was with you all night, and so was Joy and January  and Jarvis –or whatever his brother's name is, you didn't do that?

A:      No.  And I can give you two reasons why I didn't.

Q:      Let me just ask the questions.  Mr. Hamilton can follow up, if he wants to.  And in fact the testimony from Mr. Damon Lee is that Mr. Hamilton contacted him about two weeks ago. Assuming Mr. Hamilton is doing his job and making contact as soon as possible when he learns of this evidence, you didn't tell Mr. Hamilton about Damon Lee until about two, two and half weeks ago?

A:      I don't recall –.

Q:      How about two and a half, three weeks ago, somewhere in that range, is that about right?  Is that about when you told Mr. Hamilton about Mr. Damon Lee –.

        MR. HAMILTON [Defense Attorney]:  I am going to object. I think he is getting into attorney client contact.

        MR. MESMAN [Prosecutor]:  No further questions.

- 31 -

(Tr. II, 587-88.)  Defense counsel did not object to the prosecutor's line of questioning as an infringement upon Petitioner's right to remain silent.  Rather, defense counsel objected to the colloquy under attorney-client privilege.  The trial court did not rule on the objection.

In his closing arguments, the prosecutor again argued that Petitioner did not mention his alibi until approximately three weeks prior to the trial:

> [Petitioner] has a police report telling you everything that the prosecution has.  He testified to that.  Within a matter of weeks he is -- I was with Damon, this is crazy.  Every minute I am in jail is an unjust minute I am in jail.  Let me get ahold of Damon, let me talk to somebody.  I have got an alibi.  Go see Damon.  Go see Jarvis.  Go see the girls.  Ho, ho, next week I am out of here, this is easy.
>
> Wait a second, this takes place, August, September, and when does Damon come on the scene, about three weeks ago when he is contacted for the first time.  Does that make sense to you?  Are we talking about what is called in the law a recent fabrication?

(Tr. II, 620-21.)  In the prosecutor's rebuttal to closing arguments, the prosecutor specifically stated that Petitioner was incarcerated for eight months without mentioning his alibi:

> Mr. Hamilton likes to shift things over and say, well, we don't have to tell the prosecution about our alibi.  And then he kind of mentions, according to the court rules, we have up to ten days before trial to do that.  Well, I would appreciate it if they would give us 20, when the events happened in August of last year.
>
> But the point that he wants you to gloss over and miss on that is that for eight months or half a year, it is from August until the end of April this year, [Petitioner] sets [SIC] in jail without saying a word about an alibi.  That is his key out of the cell.
>
> He doesn't come right out and say, Officer Lyman, got to talk to you, go check out Damon Lee.  Joy, January, Jarvis, whoever else was there, his mom, blah, blah, go down there and talk to them.  And that never happened.  It happens twenty days before the trial begins.

***

> [A]nd if Nate Westberg is truly innocent he is going to say,
> whoa, time out. I wasn't there. I came down here with Joshua
> Powell to party, and Powell was at the party with me. Yea? And
> Powell left, and I left.

(Tr. II, 650-51, 654.) Defense counsel also did not object to the prosecutor's closing arguments or rebuttal arguments.

The Michigan Court of Appeals rejected Petitioner's Fifth and Fourteenth Amendment claims, finding that the issues were waived by defense counsel's failure to make an objection. The court further concluded that Petitioner failed to show that the prosecutor's conduct constituted plain error that affected a substantial right. The court stated:

> Defendant next asserts that the prosecution engaged in numerous acts of prosecutorial misconduct during its closing arguments. A claim of prosecutorial misconduct is a constitutional issue that is generally reviewed de novo. *People v. Pfaffle*, 246 Mich App 282, 288; 632 NW2d 162 (2001). However, because defendant failed to preserve the issue, we review it only for plain error affecting his substantial rights. *People v. Goodin*, 257 Mich App 425, 431-432; 668 NW2d 392 (2003).

> Prosecutors are "'free to argue the evidence and all reasonable inferences from the evidence as it relates to [their] theory of the case.'" *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995), *quoting People v Gonzalez*, 178 Mich App 526, 535; 444 NW2d 228 (1989). They are given wide latitude and need not confine their arguments to the blandest of all possible terms. *People v Aldrich*, 246 Mich App 101, 112; 631 NW2d 67 (2001). In the instant case, the prosecution argued that defendant sat in jail for eight months without saying anything about his alibi. We find that this statement and the numerous other statements that defendant contends were improper in the instant case constituted fair comments on the evidence presented. Furthermore, "[b]ecause defendant testified at trial, the prosecutor's comments did not, and could not, impinge on defendant's Fifth Amendment right not to testify." *People v Fields*, 450 Mich 94, 109; 538 NW2d 356 (1995). None of the prosecution's comments constituted plain error, and we decline to further review the issue. Furthermore, because defense counsel need not "make a meritless motion or a futile objection," defendant's attorney did no[t] err in failing [to] object to the prosecutor's remarks. *Goodin*, *supra* at 433.

(MCOA Op. at 3.)

- 33 -

Respondent contends that Petitioner's claims are procedurally defaulted because they were deemed waived by the Michigan Court of Appeals. (Resp't Answer at 8, docket #7.) When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). However, the U.S. Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)). *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other grounds*, *Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

The Fifth Amendment provides, in relevant part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. This provision applies to the states via the Due Process Clause of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964). The Supreme Court has determined that this provision "forbids

either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609 (1965). Likewise, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle v. Ohio*, 426 U.S. 610, 618 (1976).

### A.    Fourteenth Amendment

Petitioner argues that the prosecutor's reference to Petitioner's post-arrest, post-*Miranda* silence during cross-examination, closing arguments and rebuttal arguments violated Petitioner's due process rights under the Fourteenth Amendment. Petitioner's Fourteenth Amendment claim implicates the Supreme Court's holding in *Doyle*, 426 U.S. 610. In *Doyle*, the defendants were arrested for selling marijuana. They were given *Miranda* warnings and made no post-arrest statement about their involvement in the crime. At trial, the defendants took the witness stand and offered an exculpatory explanation for their participation in an alleged drug transaction. On cross-examination, the prosecutor impeached their testimony by repeatedly asking them why they had not explained their conduct at the time of their arrest. The Court held that *Miranda* warnings carry an implicit assurance "that silence will carry no penalty," and, thus, it would be fundamentally unfair and a violation of due process to use the defendants' post-arrest, post-*Miranda* silence for impeachment purposes. *Doyle*, 426 U.S. at 618.

Ten years later in *Wainwright v. Greenfield*, 474 U.S. 284, 290 (1986), the Supreme Court noted that, "[t]he critical importance of the implied promise that is conveyed to an arrested person by the *Miranda* warnings has been repeatedly confirmed in subsequent decisions."  In *Wainwright*, the respondent was given *Miranda* warnings three times following his arrest. In each

instance, he invoked his right to remain silent and stated that he wished to speak to an attorney before answering any questions. *Wainwright*, 474 U.S. at 286. The respondent later pleaded guilty by reason of insanity. During closing arguments, the prosecutor reviewed police officer testimony as to the occasions on which respondent had exercised his right to remain silent and implied that the respondent's invocation of his right to remain silent and request for an attorney demonstrated a degree of comprehension that was inconsistent with his insanity defense. *Id.* at 287. The Supreme Court held that the prosecutor's use of the respondent's post-arrest, post-*Miranda* silence as evidence of sanity violated the Due Process Clause. *Id.* at 295. The Court observed that "*Doyle* and subsequent cases have, thus, made clear that breaching the implied assurance of the *Miranda* warnings is an affront to the fundamental fairness that the Due Process Clause requires." *Id.* at 291. The Court also noted that post-*Miranda* "silence" includes not only muteness, but statements of a desire to remain silent and of a desire to remain silent until an attorney has been consulted. *Id.* at 295.

A year after *Wainwright* was decided, the Supreme Court found no due process violation under circumstances where the prosecutor made a brief reference to the defendant's post-arrest silence. In *Greer v. Miller*, 483 U.S. 756 (1987), the defendant and two other men were charged with kidnaping, robbery and murder. The defendant testified on direct examination that he had taken no part in the crime, but that the other men had come to him after the murder was committed seeking his advice. *Id.* at 758. At the beginning of the defendant's cross-examination, the prosecutor asked him: "Why didn't you tell this story to anybody when you got arrested?" *Id.* at 759. Defense counsel immediately objected and, out of the jury's hearing, requested a mistrial on the ground that the prosecutor's question violated the defendant's right to remain silent after

arrest.  The judge denied the motion, but immediately sustained the objection and instructed the jury to "ignore [the] question, for the time being."  *Id.*  The prosecutor did not pursue the issue further, nor did he mention it during his closing argument. The judge's final instructions to the jury included a caution to "disregard questions . . . to which objections were sustained."  *Id.*  The Court held that no *Doyle* violation occurred because the prosecutor was stopped before he called attention to the defendant's silence or used his silence for impeachment purposes.  *Id.* at 764-65.

Notwithstanding the lack of *Doyle* error, the Supreme Court went on to consider whether the prosecutor attempted to violate the rule of *Doyle* by asking an improper question in the presence of the jury.  *Greer*, 483 U.S. at 765.  The Court concluded that the prosecutor's conduct did not deny the respondent a fair trial, stating:  The sequence of events in this case -- a single question, an immediate objection, and two curative instructions -- clearly indicates that the prosecutor's improper question did not violate Miller's due process rights.  *Id.* at 766.

In the instant case, the Michigan Court of Appeals failed to apply the relevant Supreme Court case law.  Instead, the appellate court held that, the prosecutor's colloquy while cross-examining Petitioner and during closing arguments and rebuttal arguments constituted fair comments on the evidence presented.  The court's conclusion is directly contrary to the Supreme Court's decision in *Doyle*, 426 U.S. 610.  *See Williams*, 529 U.S. 362 (a decision is contrary to Supreme Court law when the state court "arrived at a conclusion opposite to that reached by the Supreme Court on a question of law, or decided a case differently than the Supreme Court on materially indistinguishable facts").  During Petitioner's cross-examination and the prosecutor's closing arguments, the prosecutor focused on the fact that Petitioner did not come forward with his alibi until three weeks prior to trial even though Petitioner was aware of the facts against him within

a matter of weeks from his arrest. (Tr. II, 587-88, 620-21.) Those comments imply that Petitioner was silent for eight months while he was in jail. In rebuttal closing arguments, however, the prosecutor blatantly referenced Petitioner's post-*Miranda* invocation of his right to remain silent. The prosecutor specifically stated that Petitioner sat in jail for eight months "without saying a word about an alibi." (Tr. II, 650.) Unlike the brief question at issue in *Greer*, the prosecutor in this case argued three times that Petitioner did not come forward with his alibi until several months after he was arrested. Accordingly, the prosecutor violated Petitioner's Fourteenth Amendment rights under *Doyle*.

The Supreme Court distinguishes between two types of constitutional errors: structural error and trial error. *See Arizona v. Fulminate,* 499 U.S. 279, 306-10 (1991). "A structural error is a defect in the trial mechanism itself, affecting the entire trial process, and is *per se* prejudicial," whereas "trial error occurs during the presentation of the case to the jury, and may be quantitatively assessed in the context of all other evidence." *Yohn v. Love,* 76 F.3d 508, 522 (3d Cir. 1996) (citations omitted). The Supreme Court explained that "*Doyle* error fits squarely into the category of constitutional violations which we have characterized as trial error." *Brecht v. Abrahamson,* 507 U.S. 619, 629, 637-38 (1993). The *Brecht* rule applies even when the "federal habeas court is the first to review for harmless error." *Gilliam v. Mitchell,* 179 F.3d 990, 995 (6th Cir. 1999). Under *Brecht,* a *Doyle* error only warrants reversal if the mistake "had substantial or injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 637. This would entail "a *de novo* examination of the trial record." *Brecht,* 507 U.S. at 642. A "reasonable possibility" that the error influenced the outcome is not enough to warrant relief. *Id.* Rather, the

defendant must show a "reasonable probability" that the error affected the verdict. *Kyles v. Whitley,* 514 U.S. 419, 435 (1995).

The evidence against Petitioner was strong, and the references at issue did nothing to undermine the strength of that evidence. Three people implicated Petitioner in the August 26, 2002 crime. (Tr. II, 73, 76-78, 110.) Ernesto Soto, Joshua Powell and J.R. testified that Petitioner helped plan and participate in the robbery at GVSU on August 26. (Tr. II, 73, 76-78, 110.) Because of their testimony against Petitioner, Soto and J.R. received reduced charges. (Tr. II, 67, 250.) Powell did not receive any reduced charge for his testimony. (Tr. II, 414.)

J.R. testified that he initially organized the robbery because his girlfriend, who worked at GVSU, told him about the large sum of money that GVSU receives from the sale of calling cards during the first week of school. (Tr. II, 253, 284.) J.R. approached Powell and Petitioner about the money. (Tr. II, 254.) J.R. picked Sunday, August 25, and Monday, August 26, as the dates to take the money. (Tr. II, 257.) J.R., however, eventually backed out. (Tr. II, 262.) When J.R. backed out, Soto testified that Petitioner contacted him to be the lookout for the robbery. (Tr. II, 73, 76, 128-29.) Soto lived in Chicago. (Tr. II, 65-66.)

The weekend before August 26, Powell testified that he and Petitioner drove to Chicago, rented a car at the Chicago O'Hare International Airport, picked Soto up, and headed back to Grand Rapids. (Tr. II, 425-33.) Both Powell and Soto stated that on the way back to Grand Rapids, they stopped at a rest area where Petitioner and Powell changed clothes and Soto borrowed one of Petitioner's sweatshirts. (Tr. II, 81-83, 85, 425-34.) Soto testified that they arrived at GVSU around 5:00 a.m. (Tr. II, 93-94.) Soto took the police scanner and walkie-talkie to communicate

with Petitioner and Powell and to notify them if the police were on their way.  (Tr. II, 92, 97-98, 104.)

Soto saw Powell and Petitioner put on their masks and gloves.  (Tr. II, 100-02.) Powell stated that Petitioner broke the glass to enter the building because the glass cutter did not work very well.  (Tr. II, 438-40.)  Petitioner entered the building first.  (Tr. II, 439-40.)  When Powell caught up to Petitioner, he was struggling with the victim.  (Tr. II, 441.)  Petitioner had a crowbar in his hand.  (Tr. II, 441.)  The victim testified that the person with a crowbar hit him several times.  (Tr. II, 12, 16.)  Powell stated that they stole around $500.00 from GVSU.  (Tr. II, 455.)

After the robbery, Powell called J.R.  (Tr. II, 264-65, 451.)  J.R. met Powell and Petitioner at a Big Boy around 10:30 a.m.  (Tr. II, 317-20.)  J.R. testified that Petitioner told him at Big Boy that they broke into a window to enter the building.  (Tr. II, 269.)  Once inside, Petitioner hit  a man.  (Tr. II, 269-70.)  J.R. stated that Powell asked him to get rid of a bundle of clothes in the back of the truck.  (Tr. II, 270.)  J.R. disposed of Powell and Petitioner's clothes and a flashlight. (Tr. II, 265, 452-53.)

The physical evidence also tied Petitioner to the crime.  Sheila Tyler, Amanda Souder and Powell testified that Petitioner purchased the following items days before the crime:  masks, walkie-talkies, the police scanner and a glass cutter.  (Tr. II, 244, 359-66, 366, 422, 423-25.)  With the help of J.R., Officer Brandon DeHaan testified that he recovered two pairs of pants, gloves, masks and a flashlight from where J.R. disposed of the items after the robbery.  (Tr. II, 317-24.) Officer DeHaan stated that he found a bus pass with Petitioner's name and signature on the back in the pocket of one pair of the pants.  (Tr. II, 323.)  In that same pair of pants, Officer DeHaan found

a glass cutter. (Tr. II, 323.) When Petitioner was arrested, the police also searched his backpack. (Tr. II, 220-21.) In the backpack, Detective John Lyman recovered a receipt for the police scanner and a parking ticket at the Chicago O'Hare International Airport. (Tr. II, 220-22, 224-27.) The police also ran DNA tests on the two recovered masks. (Tr. II, 387.) Paul Donald testified that Powell's DNA was similar to the DNA found in one of the masks as a major contributor and Petitioner's DNA was similar to the DNA found in the same mask as a minor contributor. (Tr. II, 398, 402-04.)

For the defense, Petitioner testified that he and Powell traveled to Chicago on Friday or Saturday, August 24 or 25. (Tr. II, 545, 572.) After renting a car at the airport, Petitioner and Powell stopped at Petitioner's parents' house and then partied at Damon Lee's house while Lee's mother worked. (Tr. II, 546-49, 572-75.) Based on his testimony, Petitioner implicated Powell as the robber because Powell allegedly left Lee's party around midnight and did not return until approximately noon the following afternoon. (*See* Tr. II, 551-52, 578.) Petitioner also mentioned that Soto lived five minutes from Petitioner's parents' home. (Tr. II, 590.) Despite their friendship and long drive back to Lansing, Petitioner testified that Powell never mentioned anything about the robbery. (Tr. II, 581-82.)

Damon Lee testified as an alibi witness that Petitioner and Powell were in Chicago during Harvest Festival. (Tr. II, 499.) Petitioner and Powell came to Lee's house to drink with a couple other friends, including girls named Joy and January. (Tr. II, 499, 501.) Lee stated that Powell left around 1:00 a.m. and returned around 11:00 a.m. the following morning. (Tr. II, 502, 511.) Lee also testified that Petitioner left Lee's house around 6:30 a.m. with Joy. (Tr. II, 502.) Later that morning, Petitioner came back to Lee's house with Joy to wait for Powell. (Tr. II, 504.)

Petitioner and Powell ultimately left Lee's house around noon. (Tr. II, 506, 512.) Lee also testified that he smoked marijuana that night and was drunk. (Tr. II, 510, 515.) Lee's testimony did not provide a credible alibi for Petitioner. First, Lee stated that Petitioner and Powell were in Chicago during Harvest Festival. Officer Brandon DeHaan testified that Harvest Festival occurred the weekend after the robbery, between August 30 and September 1, 2002. (*See* Tr. II, 600-01.) Second, Lee was high and drunk on the night in question. Even if the jury believed Lee's testimony, both Powell and Petitioner could have committed the crime on August 26, 2002, the weekend before Harvest Festival. In light of the overwhelming evidence of Petitioner's guilt, the reference to Petitioner's post-*Miranda* silence was far from having a substantial or injurious effect on the verdict. Accordingly, Petitioner is not entitled to habeas relief on his post-arrest, post-*Miranda* Fourteenth Amendment claim.

### B.        Fifth Amendment

Petitioner argues that the prosecutor's reference to Petitioner's post-arrest, post-*Miranda* silence during cross-examination, closing arguments and rebuttal arguments violated Petitioner's right against self-incrimination under the Fifth Amendment. A defendant in a criminal case has a constitutional right against compelled self-incrimination. U.S. CONST. Amend. V. To effectuate this right, a prosecutor may not make any reference to or comment upon a defendant's failure to testify. *Griffin,* 380 U.S. at 615. As stated above, the Michigan Court of Appeals rejected Petitioner's Fifth Amendment claim because Petitioner testified at trial. (MCOA Op. at 3.)

The Michigan Court of Appeals' decision was not an unreasonable application of Supreme Court precedent. In taking the stand, Petitioner waived his right to remain silent. *Traylor v. Price,* No. 4:03-cv-26, 2005 WL 2137793, at *7 (W.D. Mich. Aug. 1, 2005) (citing *Brown v.*

*United States,* 356 U.S. 148, 155-56 (1958)). The prosecutor did not violate Petitioner's Fifth Amendment rights because Petitioner testified at trial. Accordingly, Petitioner's Fifth Amendment right against self-incrimination was not at issue in this case.

In his application for habeas corpus relief, Petitioner argues that his Fifth Amendment rights were violated under the Supreme Court case of *Griffin,* 380 U.S. 609. (Br. in Supp. at 21-23, docket #2.) The *Griffin* Court held that neither the court nor prosecutor may invite the jury to infer guilt from Petitioner's decision not to testify. They may not "solemnize[] the silence of the accused into evidence against him," *Griffin*, 380 U.S. at 614, or "suggest[] to the jury that it may treat the defendants's silence as substantive evidence of guilt," *Baxter v. Palmigiano,* 425 U.S. 308, 319 (1976). Because Petitioner testified at trial, I find that the Michigan Court of Appeals' decision rejecting his claim was not based on an unreasonable determination of the facts and was neither contrary to nor an unreasonable application of established Supreme Court precedent. 28 U.S.C. § 2254(d). Even if the prosecutor's comments violated the Fifth Amendment, any error would not have had a substantial and injurious effect on the jury's verdict given the strong evidence against Petitioner. Accordingly, Petitioner's habeas claim fails.

## II. Ground II: Sentencing Errors

In his second ground for habeas corpus relief, Petitioner claims that his due process rights were violated when the trial court sentenced him on the basis of inaccurate information. Specifically, Petitioner contends that the trial court erred in scoring fifty points for "aggravated physical abuse" of the victim under Offense Variable (OV) 7 and in scoring ten points for Petitioner being a "leader in a multiple offender situation" under OV 14 of the Michigan Sentencing Guidelines,

which resulted in an inflated guideline range. He also claims that he was sentenced in violation of *Blakely v. Washington*, 542 U.S. 296 (2004).

### A.    Guidelines Scoring

Claims concerning the improper scoring of sentencing guidelines are state-law claims and typically are not cognizable in habeas corpus proceedings. *See Hutto v. Davis*, 454 U.S. 370, 373-74 (1982) (federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature); *Austin v. Jackson*, 213 F.3d 298, 301-02 (6th Cir. 2000) (alleged violation of state law with respect to sentencing is not subject to federal habeas relief); *Cheatham v. Hosey*, No. 93-1319, 1993 WL 478854, at *2 (6th Cir. Nov. 19, 1993) (departure from sentencing guidelines is an issue of state law, and, thus, not cognizable in federal habeas review); *Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (the sentencing guidelines establish only rules of state law). There is no constitutional right to individualized sentencing. *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995). Moreover, a criminal defendant has "no federal constitutional right to be sentenced within Michigan's guideline minimum sentence recommendations." *Doyle v. Scutt*, 347 F. Supp. 2d 474, 485 (E.D. Mich. 2004); *accord Lovely v. Jackson*, 337 F. Supp. 2d 969, 977 (E.D. Mich. 2004); *Thomas v. Foltz*, 654 F. Supp. 105, 106-07 (E.D. Mich. 1987).

Although state law errors generally are not reviewable in a federal habeas proceeding, an alleged violation of state law "could, potentially, 'be sufficiently egregious to amount to a denial of equal protection or of due process of law guaranteed by the Fourteenth Amendment.'" *Koras v. Robinson,* 123 F. App'x 207, 213 (6th Cir. Feb. 15, 2005) (citing *Bowling v. Parker*, 344 F.3d 487, 521 (6th Cir. 2003)). *See also Doyle*, 347 F. Supp. 2d at 485 (a habeas court "will not set aside, on

allegations of unfairness or an abuse of discretion, terms of a sentence that is within state statutory

limits unless the sentence is so disproportionate to the crime as to be completely arbitrary and

shocking.") (citation omitted).  A sentence may violate due process if it is based upon material

"misinformation of constitutional magnitude."  *Koras,* 123 F. App'x at 213 (quoting *Roberts v.*

*United States,* 445 U.S. 552, 556 (1980)); *see also United States v. Tucker,* 404 U.S. 443, 447 (1972)*;*

*Townsend v. Burke,* 334 U.S. 736, 741 (1948).  To prevail on such a claim, the petitioner must show

(1) that the information before the sentencing court was materially false, and (2) that the court relied

on the false information in imposing the sentence.  *Tucker*, 404 U.S. at 447; *United States v. Polselli*,

747 F.2d 356, 358 (6th Cir. 1984);  *Koras,* 123 F. App'x at 213 (quoting *United States v. Stevens,* 851

F.2d 140, 143 (6th Cir. 1988)).  A sentencing court demonstrates actual reliance on misinformation

when the court gives "explicit attention" to it, "found[s]" its sentence "at least in part" on it, or gives

"specific consideration" to the information before imposing sentence.  *Tucker*, 404 U.S. at 444, 447.

 The Michigan Court of Appeals found that the trial court properly scored OV 7 and

OV 14.  The court of appeals explained:

> Additionally, defendant argues that the trial court erred in scoring Offense Variable Seven (OV 7), aggravated physical abuse. This variable requires a trial court to score fifty points if "[a] victim was treated with sadism, torture, or excessive brutality or conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." MCL 777.37.  A sentencing court has discretion in determining the number of points to be scored under an offense variable. *People v. Hornsby*, 251 Mich App 462, 468; 650 NW2d 700 (2002).  We uphold a sentencing court's scoring decisions where there is any evidence in the record to support them. *Id.*
>
> In scoring OV 7 at fifty points, the trial court noted that the testimony at trial showed that defendant, armed with a pry bar, repeatedly struck the victim in the head.  Defendant continued to hit the victim's legs with this weapon after the victim attempted to protect himself by crawling under a table.  This beating continued for

approximately 5 to 10 minutes, even after the victim stated he was finished resisting and told defendant where to locate the money. The police officer who responded to the incident stated that the victim feared he was going to die, was bleeding excessively, and lost consciousness. We reject defendant's contention that the trial court erred in scoring defendant fifty points for OV 7. The trial court's description of the offense is supported by the testimony given at trial by the victim, the responding officer, and Powell. Because there was evidence that defendant treated the victim with excessive brutality, the evidence supports a score of fifty points for OV 7.

Defendant also asserts that the trial court erred in scoring Offense Variable Fourteen (OV 14), regarding the offender's role in the crime. MCL 777.44. This variable requires the trial court to assess ten points where "[t]he offender was a leader in a multiple offender situation." MCL 777.44(1)(a). If three or more offenders were involved, the court may determine that more than one of them acted as a leader. MCL 777.44(2)(b). And "[t]he entire criminal transaction should be considered when scoring this variable." MCL 777.44(2)(a). In scoring this variable, the trial court stated that, although defendant and Powell may have been co-leaders, defendant was a leader in relation to Soto, the third participant in the crime. Soto's testimony that defendant recruited him to serve as a lookout during the break-in provides some evidence to support this determination. Thus, we find that the trial court did not err in scoring ten points for OV 14.

Defendant filed a supplemental brief in which he argues that when scoring the sentencing guidelines, the trial court relied on facts not found by the jury in violation of *Blakely v Washington*, 542 US ___; 124 S Ct 2531; 159 L Ed 2d 403 (2004). Our Supreme Court has stated that *Blakely*, which reviewed the state of Washington's determinate sentencing scheme, does not apply to Michigan's indeterminate sentencing scheme. *People v Claypool*, 470 Mich 715, 730 n 14; 684 NW2d 278 (2004). Accordingly, we decline to further address this issue.

Because the trial court did not err in calculating defendant's score under either OV 7 or OV 14 and defendant's sentences fall within the range provided by the statutory guidelines, we must affirm his sentences. MCL 769.34(10).

(MCOA Op. 4-5.)

Petitioner's sentence of 15 to 40 years for armed robbery, 6 to 10 years for breaking and entering a building with intent to commit larceny and 6 to 10 years for conspiracy to commit breaking and entering are within the statutory limits and not so disproportionate to Petitioner's crimes as to be arbitrary or shocking. *Doyle*, 347 F. Supp. 2d at 485. Further, the trial court's factual findings for OV 7 and OV 10 are entitled to a presumption of correctness in this Court. *See* 28 U.S.C. § 2254(e). Petitioner does not argue, much less show by clear and convincing evidence, that the facts found by the court at sentencing were either materially false or based on false information. *Tucker*, 404 U.S. at 447. Instead, Petitioner argues only that the court's sentencing findings were not sufficiently supported. Such claims clearly fall far short of the sort of egregious circumstances implicating due process. The Michigan Court of Appeals' rejection of Petitioner's claim was not based on an unreasonable determination of the facts and was neither contrary to nor an unreasonable application of established Supreme Court precedent. 28 U.S.C. § 2254(d).

**B.**    ***Blakely v. Washington***

Petitioner also claims that he was sentenced in violation of *Blakely v. Washington*, 542 U.S. 296 (2004). *Blakely* concerned the State of Washington's determinate sentencing system, which allowed a trial judge to elevate the maximum sentence permitted by law on the basis of facts not found by the jury but by the judge. Applying the Washington mandatory sentencing guidelines, the trial judge found facts that increased the maximum sentence faced by the defendant. The Supreme Court found that this scheme offended the Sixth Amendment, because any fact that increases or enhances a penalty for the crime beyond the prescribed statutory maximum for the offense must be submitted to the jury and proven beyond a reasonable doubt. *Blakely*, 542 U.S. at 301 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Unlike the State of Washington's determinate sentencing system, the State of Michigan has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum term. The maximum sentence is not determined by the trial judge, but is set by law. *See People v. Drohan,* 715 N.W.2d 778, 789-92 (Mich. 2006) (citing MICH. COMP. LAWS § 769.8). Only the minimum sentence is based on the applicable sentencing guideline range. *Id.; and see People v. Babcock*, 666 N.W.2d 231, 237 n.7 (Mich. 2003) (citing MICH. COMP. LAWS § 769.34(2)). Therefore, under Michigan law, the trial judge sets the minimum sentence (within a certain range), but can never exceed the maximum sentence. *See Chontos v. Berghuis,* ___ F.3d ___, 2009 WL 3734675, at *1 (6th Cir. Nov. 10, 2009) (*Apprendi* line of cases does not apply to Michigan's indeterminate sentencing scheme because judicial factfinding affects only the minimum sentence); *Drohan,*715 N.W.2d at 789.

Because the trial court can never exceed the maximum sentence set by statute, Michigan's indeterminate sentencing scheme, unlike the determinate sentencing scheme at issue in *Blakely*, does not infringe on the province of the finder of fact, and, thus, does not run afoul of *Blakely*. *See Blakely,* 542 U.S. at 304-05, 308-09. Because the trial court in the present case sentenced Petitioner well within the parameters of Michigan's indeterminate sentencing scheme, it did not violate his Sixth Amendment rights. *See Chontos*, 2009 WL 3734675, at *1; *Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007) (affirming district court's dismissal of prisoner's claim under *Blakely v. Washington* because it does not apply to Michigan's indeterminate sentencing scheme); *see also Gray v. Bell*, No. 1:06-cv-611, 2007 WL 172519, at *3 (W.D. Mich. Jan. 19, 2007); *Pettiway v. Palmer,* No. 1:06-cv-132, 2006 WL 1430062, at *1 (W.D. Mich. May 23, 2006); *Stanley v. Jones,* No. 1:06-cv-49, 2006 WL 1459832, at *2 (W.D. Mich. May 23, 2006); *Jones v. Trombley*,

No. 2:07-cv-10139, 2007 WL 405835, at *3 (E.D. Mich. Jan. 31, 2007); *Mays v. Trombley*, No. 2:06-cv-14043, 2006 WL 3104656, at *3 (E.D. Mich. Oct. 31, 2006); *Worley v. Palmer,* No. 2:06-cv-13467, 2006 WL 2347615, * 2 (E.D. Mich. Aug. 11, 2006); *George v. Burt*, No. 2:04-cv-74968, 2006 WL 156396, at *5 (E.D. Mich. Jan. 20, 2006); *Walton v. McKee*, No. 2:04-cv-73695, 2005 WL 1343060, at *3 (E.D. Mich. June 1, 2005).

## **Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Date:  December 29, 2009                             /s/ Ellen S. Carmody
                                                    ELLEN S. CARMODY
                                                    United States Magistrate Judge


## **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).